**Opinion issued March 12, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00525-CR

———————————

**JOHN RAY DELEON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 185th District Court**
**Harris County, Texas**
**Trial Court Case No. 1563868**

---

## MEMORANDUM OPINION

A jury found appellant, John Ray DeLeon, guilty of aggravated assault. Pursuant to a plea bargain with the State, appellant pled true to two previous convictions, and the trial court sentenced appellant to 25 years in prison. In his

sole point of error, appellant argues that the evidence is legally insufficient to support his conviction. We affirm.

**Background**

On September 4, 2017, Officer K. Smallwood, of the Houston Police Department, testified that he responded to a call at 7719 Avenue I around 5:05 p.m. where he met with Annette DeLeon, who appeared angry and upset. Officer Smallwood observed that a car at the home had a broken taillight and and a dryer vent had been damaged. Officer Smallwood suspected appellant had caused the damage, but because he was not home at the time, Officer Smallwood referred Annette to additional resources so that she could speak with someone about her problems.

Later that same evening, Officer J. Sanchez, of the Houston Police Department, testified that he received a call for a family disturbance at 7719 Avenue I in Harris County. Officer Sanchez testified that upon arriving at the home, the complainant, Joanne Martinez, had to open the locked driveway gate. As they were opening the gate, Officer Sanchez noticed that appellant appeared at the front of the home, holding a knife. Appellant's wife, Annette, also appeared outside. Officer Sanchez and his partner ordered appellant to drop the knife. While appellant refused to drop the knife, Joanne opened the gate and Officer Sanchez and his partner entered the property, pointed their guns at appellant, and

2

continued to order him to drop the knife. Instead of dropping the knife, appellant chased Annette around a vehicle on the driveway. After Annette escaped, the officers confronted appellant again and repeated their orders for him to drop his knife. Officer Sanchez testified that appellant then grabbed Joanne and put the knife "to her throat." After a short struggle, Joanne was able to "smack[] the knife away" from appellant, at which time the officers tackled appellant and handcuffed him.

On cross-examination, Officer Sanchez admitted that appellant, while officers were pointing their guns at him, asked if the officers were going to shoot him. Officer Sanchez also admitted that appellant did not say he was going to kill or harm Joanne.

The State showed the jury a body-cam video, which depicted the officers arriving at the house, Joanne opening the gate, Annette running away from appellant who was holding a knife, and appellant grabbing Joanne while still holding the knife.

Joanne testified that she lives with her niece, Annette, on Avenue I. She testified that on September 4, she saw Annette arguing with appellant. After the arguing, appellant left the home, while she and Annette went and purchased a lock to prevent appellant from returning. Joanne testified that appellant later returned and entered the home by breaking a window. Joanne saw Annette call 911, and

3

she helped the police enter the property. Joanne described seeing appellant, while holding a knife, chasing Annette around a tree. Joanne testified that appellant eventually grabbed her and had an arm across her, but she was able to knock appellant's hand down, which caused appellant to drop the knife. Joanne testified that while appellant was holding her, she felt scared that he might kill her.

On cross-examination, Joanne said that appellant did not put the knife to her throat and did not make any motion to try and stab her. But, she also said "I was just afraid, my life, that's it." She also testified that appellant was telling the officers to shoot him.

In defense, appellant called his wife, Annette, who testified that they were having an afternoon barbecue that lasted three to four hours. She recalled being upset that day, due to a problem with one of the toilets and did not want to have guests over. After she argued with him, appellant became angry, broke the air vent to the dryer and a light on her van, and then left. Annette then called 911. After purchasing a lock to secure the gate around her home, Annette locked her home's door, knowing that appellant would be unable to enter. Later that evening, Annette heard the sound of breaking glass and knew that appellant had returned. Annette called 911 again. Annette recalled that while the police were entering the gate, appellant was standing at the door holding a knife. Annette did not see appellant point the knife at Joanne or Joanne's neck.

4

On cross-examination, Annette admitted that she called the police at 5 p.m. the first time and that she called them a second time because she was scared when appellant returned and heard him banging on the door. She also admitted that when she called the police a second time, she told the operator that appellant had a knife. She testified that when the police arrived, appellant, while holding the knife, chased her around a car. She also testified that when he grabbed Joanne, he still had the knife in his hand. She further testified that she felt scared while appellant chased her with the knife and when he grabbed Joanne.

Appellant testified that earlier in the day, he had an argument with Annette, that led him to break the dryer vent and a taillight on her van. After leaving the house to drive some guests home, appellant returned home and discovered that the lock securing the gate had been replaced. Appellant admitted that this set him off because he paid the rent and she paid the bills. Appellant testified that he "jumped the gate" and broke a window to the side of the door so that he could reach in and unlock the door. When appellant's counsel asked what his intent was when he got inside, appellant answered, "to go inside and probably jump on her for locking me out and then eat and go to bed." After Annette told him that she had called the police and that they were on their way, appellant testified that he grabbed a knife from the kitchen and started preparing a plate of food. Once Annette announced that the police had arrived, appellant went outside while still holding the knife.

5

Appellant testified that he did not realize he still had the knife in his hand until the officers pulled their guns and ordered him to drop the knife. When asked what was going through his head, appellant replied, "I didn't realize I had the knife in my hand till I stepped out. . . . I panicked and I started to run—I started to go by [Annette] and she started running then the cops start yelling, Stop, put the knife down, put the knife down. And then I panicked." Appellant continues,

> So [Annette] runs off, I grabbed Joanne, I stand behind Joanne because they got their guns drawn and I panicked. And I'm actually terrified because knowing that I have a knife in my hand, I know I'm looking at some trouble, I'm going to go to prison, how am I going to explain this?
>
> But I never ever had the knife toward Joanne. I had it up in the air like this and I had Joanne, like, holding Joanne, I had the knife in the air, telling the cop, you might as well shoot me. I said it three or four times. You might as well shoot me. I'm not going back to prison. I'm not going back so you might as well shoot me. My intentions were—I figured if they saw me with my knife in my hand and holding Joanne, they would just shoot me and I wouldn't have—

Appellant explained that he wanted the police to shoot him because he had previously spent time in prison, where he had been violated, and that he was terrified of returning. When asked if he intended to hurt Joanne, appellant testified, "Never. She's a sweet woman. Matter of fact, she hugs me all the time." He further testified, "I had no intention ever to hurt Joanne. I would have never hurt her at all" and "I was terrified, terrified with panic and . . . pretty much it might not sound right but Joanne [was] standing at the wrong place at the wrong

6

time. And that doesn't make an excuse for my actions but. . . I panicked." He explained that while the police were telling him to drop the knife, Joanne elbowed him which caused him to drop the knife.

On cross-examination, appellant admitted that he broke the dryer vent because he was angry and it was the closest thing to him. After taking his guests home, appellant returned, hopped the fence, and broke a glass windowpane to reach his hand inside and open the door. Once inside, appellant argued with Annette for approximately five minutes and then went to the kitchen to make himself a plate of food. After learning that the police had arrived, appellant walked outside, not realizing that he still had the knife in his hand. When asked why he did not follow the police officers' instruction to drop the knife, appellant responded, "I refused to put it down because I wanted them to shoot me. I didn't want to go back to prison. I was terrified. Panic, I was terrified, terrified enough that I rather them have sho[o]t me than go back to prison." Appellant testified that he did not have intent to hurt or kill anyone with a knife but that he was guilty of deadly conduct. Appellant admitted that when his wife started running, he chased her.

The jury found appellant guilty of aggravated assault. Rather than have the jury assess punishment, appellant reached a plea bargain with the State, and after pleading true to two previous convictions, the trial court sentenced appellant to 25

years in prison. The trial court certified appellant's right to appeal as to guilt-innocence only.

## Aggravated Assault

In his sole point of error, appellant argues that the evidence is legally insufficient to support his conviction for aggravated assault. Specifically, appellant argues that he did not have the intent to harm Joanne.[1]

### A. Standard of Review

We review sufficiency of the evidence using the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 318 (1979). *See Brooks v. State*, 323 S.W.3d 893, 898–902 (Tex. Crim. App. 2010). Under that standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis omitted); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). We consider all reasonable inferences that may be drawn from the evidence in making our determination, including all direct and circumstantial evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We do not realign, disregard, or

---

[1] Appellant questions whether the State "should have to rule out other valid inferences from the evidence." However, as appellant admits, the Texas Court of Criminal Appeals rejected that standard of appellate review, which applied to circumstantial evidence cases, in 1991. *Geesa v. State*, 820 S.W.2d 154, 156–61 (Tex. Crim. App. 1991), *overruled in part on other grounds*, *Paulson v. State*, 28 S.W.3d 570 (Tex. Crim. App. 2000). Accordingly, we decline appellant's invitation to hold the State to a higher burden.

weigh the evidence. *Rodriguez v. State*, 939 S.W.2d 211, 218 (Tex. App.—Austin 1997, no pet.). The trier of fact has the responsibility of weighing all the evidence, resolving evidentiary conflicts, and drawing reasonable conclusions from the evidence. *Garcia v. State*, 57 S.W.3d 436, 441 (Tex. Crim. App. 2001). Essentially, we must determine "whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *See Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007).

A person commits aggravated assault with a deadly weapon if he or she intentionally or knowingly threatens another with imminent bodily injury and if he or she uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE. § 22.02(a)(2). A person acts intentionally "with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id*. § 6.03(a). A person acts knowingly "with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist[,]" or if he "is aware that his conduct is reasonably certain to cause the result." *Id*. § 6.03(b). Intent or knowledge is a fact question to be determined from the totality of the circumstances. *Smith v. State*, 965 S.W.2d 509, 518 (Tex. Crim. App. 1998); *Dobbins v. State*, 228 S.W.3d 761, 764 (Tex. App.—

Houston [14th Dist.] 2007, pet. dism'd). The jury may infer intent from circumstantial evidence, including the defendant's acts, words, or conduct. *Guevara v. State*, 152 S.W.3d 45, 49–50 (Tex. Crim. App. 2004); *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

**B.    Analysis**

Here, appellant's intent can be inferred from his acts and conduct. The jury heard Officer Sanchez testify that he saw appellant chasing Annette around a car while holding a knife. After Annette escaped, appellant then grabbed Joanne and used her as a shield while still holding the knife, despite the officers' repeated orders to drop the knife. Officer Sanchez further testified that appellant put the knife "to Joanne's throat." In support of Officer Sanchez's testimony, the jury watched a body cam video from one of the officers showing appellant grabbing Joanne while holding the knife and putting Joanne between appellant and the police.

The video evidence combined with Officer Sanchez's testimony could allow a reasonable jury to find that appellant intentionally or knowingly threatened Joanne with serious bodily injury. *See Church v. State*, 552 S.W.2d 138, 141 (Tex. Crim. App. 1977) (holding that evidence defendant grabbed complainant and held knife to her throat was sufficient to prove threat of serious bodily injury); *see also Fitzgerald v. State*, No. 11–04–00250–CR, 2006 WL 246277, at \*5 (Tex. App.—

Eastland Feb. 2, 2006, no pet.) (not designated for publication) (evidence was sufficient to establish threat of imminent bodily injury when defendant held and waved knives in threatening manner in close proximity to victim).

While appellant provided evidence that he was merely trying to get the police to shoot him and no intent to injure Joanne, the jury weighed this evidence against the State's evidence. The jury has the responsibility of weighing all the evidence, resolving any evidentiary conflicts, and drawing reasonable conclusions from the evidence presented at trial. *See Garcia*, 57 S.W.3d at 441.

In light of the evidence presented and the reasonable inferences the jury was free to make, we conclude that the evidence is legally sufficient to show that appellant knowingly or intentionally committed aggravated assault with a deadly weapon.

We overrule appellant's sole point of error.

## Conclusion

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.

Do not publish.  *See* TEX. R. APP. P. 47.2(b).